DETROIT CITIZENS' STREET RAILWAY CO. v. CITY OF DETROIT.

1. STREET RAILWAYS—EXCLUSIVE FRANCHISE—CITY ORDINANCE.
   A city ordinance granting to a street-railway company the exclusive right to construct and operate its railways upon certain streets, and to construct whatever new lines the common council may from time to time determine upon, is in effect an attempted grant of an exclusive privilege, notwithstanding the municipality reserves the right, in case such company should not desire to extend its lines to streets designated by the council, to grant to other companies the privilege of operating upon such streets.

2. STREETS—POWERS OVER—CONSTRUCTION OF CONSTITUTION.
   The constitutional provisions that the State shall not be interested in any work of internal improvement, nor vacate nor alter any road laid out by commissioners of highways, or any street in any city or village, or in any recorded town plat, do not operate to take from the legislature, and confer upon local authorities, the supreme power over the public streets.

3. MUNICIPAL CORPORATIONS—POWER TO GRANT EASEMENTS IN STREETS.
   A municipality has no power, except as derived from the legislature, to grant to a street-railway company an easement in its streets.

4. SAME—EXCLUSIVE PRIVILEGES.
    The power to grant *exclusive* rights will not be implied from general language in a statute, but must be clearly and explicitly expressed.

5. SAME—STATUTORY CONSTRUCTION—PRESUMPTION.
    A statute conferring powers upon a municipality will be presumed to have been framed with reference to the rule that nothing is to be taken by intendment in construing a legislative grant of power.

6. SAME.
    Such rule is not rendered inapplicable by the fact that the power delegated is one which could be exercised only through the local authorities, and not by the legislature directly.

7. STREET RAILWAYS—EXCLUSIVE FRANCHISES—STATUTES.
    Power to grant the exclusive privilege of occupying the streets for street-railway purposes is not conferred upon municipal corporations by section 34 of the train railway act (Act No. 148, Laws 1855, as amended), providing that all companies formed for the purposes specified in the act shall have the exclusive right to use and operate any street railway constructed, owned, or held by them, *provided* that no such company shall be authorized to construct a railway through the streets of any town or city without the consent of the municipal authorities, "and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe."

Appeal from Wayne; Frazer, J. Submitted June 3, 1896. Decided July 28, 1896.

Bill by the Detroit Citizens' Street-Railway Company to restrain the city of Detroit and the Detroit Railway from carrying out the provisions of an ordinance for the construction and operation of a street-railway line. From a decree dismissing the bill, complainant appeals. Affirmed.

*Brennan, Donnelly & Van De Mark* (*Ashley Pond, Fred A. Baker, Frank Sullivan Smith*, and *James C. Carter*, of counsel), for complainant.

110 MICH.—25.

*John J. Speed*, for defendant city of Detroit.

*Charles Flowers* (*Benton Hanchett* and *H. H. Hatch*, of counsel), for defendant Detroit Railway.

MONTGOMERY, J. The bill in this case was filed to restrain the defendant the Detroit Railway from constructing and operating a street railway in certain streets in the city of Detroit, the complainant claiming to have a prior right to construct and operate a street railway in such streets under and by virtue of an ordinance of the city. The complainant is the successor to the Detroit City Railway. By an ordinance approved November 24, 1862, the Detroit City Railway was—

" Exclusively authorized to construct and operate railways, as herein provided, on and through [certain named streets], and through such other streets and avenues in said city as may from time to time be fixed and determined by vote of the common council of the said city of Detroit, and assented to in writing by said corporation;   *   *   *   and, provided the corporation does not assent in writing within thirty days after the passage of said resolution of the council ordering the formation of new routes, then the common council may give the privilege to any other company to build such route, and such other company shall have the right to cross any track or rails already laid, at their own cost and expense."

By an ordinance passed in November, 1879, the rights conferred and the obligations imposed by the ordinance of 1862 were continued until November 14, 1909.

Complainant's predecessor, the Detroit City Railway, was organized under the train railway act (Act No. 148, Laws 1855, as amended), and at the date of the adoption of the first ordinance, in 1862, section 34 of that act provided that—

"All companies or corporations formed for such purposes shall have the exclusive right to use and operate any street railways constructed, owned, or held by them; *Provided*, that no such company or corporation shall be authorized to construct a railway under this act through

the streets of any town or city without the consent of the
municipal authorities of such town or city, and under such
regulations and upon such terms and conditions as said
authorities may from time to time prescribe."

In 1867 this section was amended by adding another
proviso, which reads as follows:

"*Provided, further*, that after such consent shall
have been given, and accepted by the company or corpo-
ration to which the same is granted, such authorities shall
make no regulations or conditions whereby the rights or
franchises so granted shall be destroyed or unreasonably
inpaired, or such company or corporation be deprived of
the right of constructing, maintaining, and operating such
railway in the street in such consent or grant named,
pursuant to the terms thereof."  Act No. 188, Laws
1867.

The question first in importance is whether the common
council of the city had the inherent power, or derived the
power under this statute, to grant the privilege, not only
to build such lines as were specifically designated in the
ordinance of 1862, but to couple with this grant the
grant of the first right to build any other lines which the
city authorities might, in the future, elect to have con-
structed, on the same terms as were provided with refer-
ence to the lines specifically provided for in the ordinance
of 1862. . It is apparent from the reading of the statute
that there was no express and direct authority conferred
in terms upon the common council to grant an exclusive
privilege to occupy the streets of the city for street-rail-
way purposes.  An attempt has been made to distinguish
the right of election sought to be conferred by the ordi-
nance from a grant of an exclusive privilege, on the
ground that the municipality reserves to itself the right
to grant the privilege to other companies to construct
street railways in case the first company shall elect not
to build in designated streets.  But, while the ordinance
does not, in terms, purport to be a direct grant of an
exclusive use in all the streets of the city, it is a grant
of an *exclusive privilege*, which the company is given

the option to avail itself of or not, at its pleasure. The legislative control over the streets is suspended during a period of 30 years, except in cases where the company shall, upon investigation, determine that a line does not give sufficient promise of profit to justify it in making the requisite expenditure, when, on its refusal to build, the city regains so much of its legislative authority as enables it to provide for the construction of a particular line; but as to other streets and other lines its power is still suspended. Nor would it be possible, under the construction contended for by complainant, for the city to make other or better terms with another company prepared to build independent or competing lines. We consider that this is none the less a grant of an exclusive privilege because of the option reserved to the company to build or not, and that the rules of construction which obtain in construing such grants, and in determining whether the power to make such grant exists, should be applied.

The general rule, established by the weight of authority, is that municipal corporations have no power to grant exclusive rights to street-railway, gas, or water companies, except upon authority from the legislature, given explicitly, and clearly expressed; and that, in construing charters and statutes conferring upon a municipality the right to provide for these conveniences, the authority to grant exclusive privileges will not be implied from the use of general language. Booth, St. Ry. Law, § 108; *Grand Rapids, etc., Co.* v. *Grand Rapids, etc., Co.,* 33 Fed. 659; *Jackson, etc., Co.* v. *Interstate, etc., Co.,* 24 Fed. 306; *Saginaw Gaslight Co.* v. *City of Saginaw,* 28 Fed. 529; *Parkhurst* v. *Capital City R. Co.,* 23 Or. 471; *Long* v. *City of Duluth,* 49 Minn. 280 (32 Am. St. Rep. 547); 2 Cook, Stock, Stockh. & Corp. Law, § 913. It is conceded that the weight of authority establishes this rule, but it is contended that this is, after all, but a rule of construction, and that the paramount rule of construction is that the intent of the legislature, when gath-

ered from the whole terms of the enactment, should control. We recognize the force of this latter rule, except in a case where it crosses lines with another well-understood rule of construction. But courts are not at liberty to resort to this rule, and to discard another rule of construction; for, in ascertaining the intent, it must be assumed that the statute was adopted in view of the recognized rule that nothing is to be taken by intendment in construing a legislative grant of power.

The principal contention of complainant's counsel is that the policy of our Constitution, which favors local self-government, should have controlling effect in determining the legislative intent in this case, and that because of this policy the cases cited from other States to sustain the proposition that a municipality does not possess the power to grant an exclusive privilege, except the same be conferred in express terms, should not have controlling effect. To some extent counsel for complainant differ in the scope of their contention as to the effect of certain provisions of our Constitution. The contention, as it is made in the brief of one of complainant's counsel, is that, under our Constitution, the sovereign power over all public streets and highways (except State roads laid out under swamp-land grants) is taken from the State legislature, and distributed among the townships, cities, and villages of the State, to be separately exercised by them; and that, therefore, the local authorities, in making street-railway grants, and in agreeing upon the terms and conditions thereof, exercise *an original* power vested in them by the Constitution of the State, and that they do not in any sense act as the agents of the State legislature by virtue of a mere delegation of authority. The provisions of the State Constitution which are cited as establishing this policy are article 14, § 9; article 11, § 1; article 4, § 23. Article 11, § 1, provides for the election of highway commissioners and overseers in townships and road districts, and can have no bearing upon the question, except as it may tend to show the general policy of the people

in dealing with the subject of highways. Article 14, § 9, reads: "The State shall not be a party to or interested in any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property." And article 4, § 23, provides: "The legislature shall not * * * vacate or alter any road laid out by commissioners of highways, or any street in any city or village, or in any recorded town plat." It is contended that these provisions take away the power from the legislature, and transfer it to the local governments. In support of this contention we are cited to the cases of *Hubbard* v. *Tp. Board of Springwells*, 25 Mich. 153; *Davies* v. *Board of Supervisors*, 89 Mich. 295; *People* v. *Hurlbut*, 24 Mich. 44 (9 Am. Rep. 103); *People, ex rel. Park Commissioners,* v. *Common Council of Detroit*, 28 Mich. 228 (15 Am. Rep. 202); *People, ex rel. Attorney General,* v. *Common Council of Detroit*, 29 Mich. 108.

In *Hubbard* v. *Tp. Board of Springwells* the question arose as to the validity of an act of the legislature authorizing an appointment by the governor of commissioners to improve Fort street, in the township of Springwells, and to collect tolls. The township was required to issue bonds and submit to taxation for the purpose of paying for the improvement. It was held that this was a work of internal improvement, and as such could not be undertaken by State agencies, and it was further held that, as commissioners and overseers of highways were constitutional officers, their functions could not be wholly abolished, nor could they be elected or appointed by other authority than the township. In this latter holding the court followed *People* v. *Hurlbut*. But in *Hubbard* v. *Tp. Board of Springwells* the court by no means holds that the control of the streets by the local authorities is supreme; on the contrary, it was said that the power of the highway commissioners was subject to legislative modification.

In *Davies* v. *Board of Supervisors* the court held, following *Hubbard* v. *Tp. Board of Springwells*, that it was incompetent to withdraw from the local authorities provided for by the Constitution the functions of their offices, and confer them upon a board appointed by a power removed from, and not responsible to, local authority.

The scope of the earlier decisions is clearly stated by Mr. Justice COOLEY in *People, ex rel. Park Commissioners*, v. *Common Council of Detroit*, 28 Mich., at page 240 (15 Am. Rep. 210). After stating that the opinion in *People* v. *Hurlbut* had been misapprehended, Justice COOLEY said:

." We intended, in that case, to concede most fully that the State must determine for each of its municipal corporations the powers it should exercise and the capacities it should possess, and that it must also decide what restrictions should be placed upon these, as well to prevent clashing of action and interest in the State as to protect individual corporators against injustice and oppression at the hands of the local majority. And what we said in that case we here repeat,—that, while it is a fundamental principle in this State, recognized and perpetuated by express provisions of the Constitution, that the people of every hamlet, town, and city of the State are entitled to the benefits of local self-government, the Constitution has not pointed out the precise extent of local powers and capacities, but has left them to be determined in each case by the legislative authority of the State, from considerations of general policy, as well as those which pertain to the local benefit and local desires. And in conferring those powers it is not to be disputed that the legislature may give extensive capacity to acquire and hold property for local purposes, or it may confine the authority within narrow bounds; and what it thus confers it may enlarge, restrict, or take away at pleasure."

This is a clear exposition of plain provisions of the Constitution. Article 4, § 38, reads: "The legislature may confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such powers of a local legislative and administrative character as they may deem proper."

The limitations upon this broad power to confer or withhold authority are that the legislature may not withhold authority from the local authorities, and confer it upon an outside agency; and under the provisions of article 4, § 23, it may not vacate or alter any road laid out by the commissioner or local authorities.    Since the adoption of the Constitution many acts have been passed relating to the control of streets, and imposing duties upon local authorities; and in special charters, as well as in the general act for the incorporation of cities, it has been deemed essential to confer and define the extent of the control over streets reposed in municipal authorities.    This court, in the case of *Taylor* v. *Railway Co.*, 80 Mich. 77, Mr. Justice GRANT speaking for the court, said, "Municipal corporations derive their sole source of power from legislative enactments."    See, also, *Saginaw Gaslight Co.* v. *City of Saginaw*, 28 Fed. 529; *Grand Rapids, etc., Co.* v. *Grand Rapids, etc., Co.*, 33 Fed. 659; *Detroit Citizens' St. R. Co.* v. *City of Detroit*, 12 C. C. A. 365, 64 Fed. 628; *City of Detroit* v. *Blackeby*, 21 Mich. 84 (4 Am. Rep. 450).    The power of a municipality to grant an easement in the street to a street-railway company is not inherent, but is derived from the legislature.

It is, however, strenuously urged upon us that, in view of the general policy in favor of local self-government, which is evidenced by the provisions of the Constitution quoted and the decisions of this court, the grant to the municipality by the legislature should receive a construction more liberal than if it were a delegation of power which the legislature could itself exercise; it being urged in the same connection that the legislature could not grant an easement or right to use a particular street for street-railway purposes.    Without affirming or denying the latter proposition, we do not think the precedent contention would be solved by a determination of that question.    It is clear that whatever power the local authorities have to grant an easement in the street for street-railway purposes is derived from the legislature, whether

the streets of a city be directly controlled by the legislature in such sense that a direct grant may be made, or whether the trust be one which may be executed through certain local authorities only.   The reasons for construing a grant of authority with strictness are equally forcible. Whether such a franchise be the subject of a grant by the State direct or by the local authorities, the power over the streets is a trust, and the authority to grant an exclusive right ought not to be implied any the more because the legislature has not reserved to itself, or does not originally possess, the power to grant an easement in a particular street.   The question whether such power is reserved to the legislature seems not to have been allowed to control the rule that the power to grant an exclusive franchise or right will not be inferred.   In *Parkhurst* v. *Capital City R. Co.*, 23 Or. 471, the court states the question as follows:

"The precise question, then, is, had the city of Salem, under the grant of an *exclusive* power 'to permit, allow, and regulate the laying down of tracks for street cars' upon such terms and conditions as it may prescribe, the power to grant for a term of years the exclusive right to occupy its streets with street railroads?"

The court said:

"It is true, this power, so far as granted, is by the charter made exclusive; that is, the city alone has the right and power to permit, allow, and regulate the use of its streets for the purpose indicated.   To this extent it is endowed with complete legislative sovereignty.   That sovereignty has no limit so long as the city keeps within the powers granted."

Yet, notwithstanding this, it was held that, as the power to grant an exclusive privilege was not expressly conferred, it was not to be implied.   Indeed, the argument in favor of the necessity that the power to grant exclusive privileges be lodged somewhere would apply with substantially the same force in case of a delegation of power which the legislature may exercise directly as

in a case where the power is conferred upon the local authorities as the only means of granting an easement. Certainly the difference is only in degree, as during the recess of the legislature the power would, in the former case as in the latter, be in the local authorities.

One very solid ground upon which the cases which hold that authority of a municipality to grant an exclusive privilege is not to be inferred in the absence of an express grant rest is that a franchise of that nature is in restraint of free competition. It does not detract from the force of these authorities that in some of the cases there has been stated a further reason that the legislature will not be presumed to have delegated its own authority except to the extent that such delegation of power is clearly expressed. In *State* v. *Cincinnati Gaslight & Coke Co.*, 18 Ohio St. 262, it was said:

" We have referred to these authorities as our justification for saying that when a franchise so far in restraint of trade, and so pregnant with public mischief and private hardship, is drawn in question, and is claimed to be derived through a municipal ordinance or contract, the power of the municipal authorities to pass the ordinance or enter into the contract must be free from doubt. It must be found on the statute book in express terms, or arise from the terms of the statute by implication so direct and necessary as to render it equally clear."

In *Saginaw Gaslight Co.* v. *City of Saginaw*, Judge Brown said:

"Nothing is better settled than that statutes creating monopolies, granting franchises and charters of incorporation, must be construed liberally in favor of the public, and strictly as against the grantee."

We think the act in question cannot be construed as conferring the power upon the common council to grant such a privilege as that which was attempted to be conferred by the ordinance of 1862. Certainly there is no express grant of the right to confer exclusive privileges, nor do we think that there is any clear implication of

any such power arising out of the terms of the act. There is a limitation upon the right of the company to construct a railway, which is that, before doing so, the company shall procure the consent of the municipal authorities under such regulations and upon such terms and conditions as said authorities may from time to time prescribe. Fairly construed, this language relates to the terms and conditions to be prescribed for the contemplated occupancy of streets the use of which is presently contemplated by the parties to the contract, and the "terms and conditions" relate to such occupancy of such streets. A broader construction is contended for, and it is said that the power to make terms and conditions carries with it an implication of power to make all terms and conditions relating to the subject-matter necessary to effectuate the object of the legislation; and that it is to be assumed, and, indeed, that the evidence in the case fairly indicates, that the grant of this exclusive privilege was essential in order to induce the railway company to undertake the construction of a railway. Of a similar contention it was said, in the case of *Long* v. *City of Duluth*, 49 Minn. 280 (32 Am. St. Rep. 547):

"It may be said that the power to contract would be useless unless the privilege conferred may be made exclusive, for otherwise private corporations or persons would not engage in an undertaking involving the necessity for very large expenditures of capital in works which might be rendered unprofitable, if not valueless, by the subsequent action of the municipal or State government. The argument is not without force. The cases cited above, and others, show that it has often been advanced in support of claims of exclusive privileges; but it has rarely, if ever, prevailed. It suggests considerations of policy which may influence the legislature to grant or to authorize the granting of exclusive privileges; but the principles in accordance with which legislative grants of this kind are to be construed seem to be so clearly established that generally not much weight can be given to such an argument in determining the effect of particular legislative action."

See, also, *Grand Rapids, etc., Co.* v. *Grand Rapids, etc., Co.,* 33 Fed. 671.

Assuming good faith on the part of the municipalities and private corporations contracting with them to be the rule, it would be difficult to imagine a case in which the attempted exercise of the right to grant an exclusive privilege could not be fortified by a well-grounded claim of necessity. We think an implication of power cannot be built up upon this claim.

Having reached the conclusion that the court below was right in holding that legislative authority to grant the privilege in question did not exist, it becomes unnecessary to discuss the numerous interesting collateral questions which have been raised and argued by counsel.

The decree of the court below will be affirmed, with costs.

The other Justices concurred.